IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-474

Filed 17 December 2024

Wake County, No. 20CVD008897

DENNIS DAVID BOSSIAN, Plaintiff,

v.

ANDREW PAUL CHICA, KIMBERLY ANN BOSSIAN, Defendants.

Appeal by plaintiff from order entered 17 February 2021 by Judge Ned Mangum in District Court, Wake County. Heard in the Court of Appeals 22 October 2024.

*Dennis D. Bossian, pro se, plaintiff-appellant.*

*Tharrington Smith, LLP, by Jeffrey R. Russell, Alice C. Stubbs, and Casey C. Fidler, for defendants-appellees.*

STROUD, Judge.

This is Father Dennis Bossian's second appeal of the trial court's order entered on 17 February 2021; the first appeal was dismissed as interlocutory. *See Bossian v. Chica*, COA21-381, 281 N.C. App. 627, 867 S.E.2d 428, *disc. rev. denied*, 873 S.E.2d 10 (2022) (unpublished) ("*Bossian I*"). Because Father's complaint fails to state a claim upon which relief may be granted, the trial court did not err by granting Defendants' motion to dismiss. The trial court, however, did not make sufficient findings to support its imposition of sanctions under Rule 11 of our North Carolina Rules of Civil Procedure. As such, we vacate the trial court's award of sanctions and

remand for entry of a new order with additional findings of fact.

## I.    Procedural and Factual Background

The relevant background preceding Father's first appeal was summarized in

this Court's opinion:

> Dennis David Bossian ("[F]ather") appeals from an order granting Kimberly Ann Bossian ("[M]other") and Andrew Paul Chica ("[D]efendant Chica"; together with [M]other, "[D]efendants") a motion to dismiss, thus dismissing [F]ather's complaint, and allowing [D]efendants' motion for Rule 11 sanctions. On appeal, [F]ather contends the trial court erred in dismissing his complaint and in imposing Rule 11 sanctions.
>
> . . . .
>
> Father and [M]other were married on 22 August 1998 and had two children, "J.J." and "J.D." "On or about" 1 August 2013, [M]other filed for divorce from [F]ather.
>
> On 12 February 2015, the trial court entered an order granting [M]other primary physical custody of the children, while granting [F]ather, who lived in Rhode Island, visitation during the children's Spring Break holiday and for two weeks during the summer.
>
> On 22 February 2016, [F]ather and [M]other agreed to allow J.D., at J.D.'s request, to move to Rhode Island and live with [F]ather. Accordingly, J.D. moved to Rhode Island in July 2016 and lived there for approximately two years. In June 2018, J.D. flew to North Carolina to stay with [M]other, who lived with [D]efendant Chica and J.J. Thereafter, J.D. never returned to Rhode Island.
>
> On 11 March 2020, [M]other filed a motion for order to show cause and, in the alternative, a motion for contempt, in which [M]other alleged [F]ather had "willfully refused to make any child support payments since January of 2016,"

had "willfully refused to pay his half of the children's unreimbursed medical expenses," and had "willfully refused to pay the $1,800 distributive award" resulting from the sale of the former marital residence. On 1 May 2020, the trial court entered an order to appear and show cause against [F]ather.

The matter came on for hearing on 25 August 2020; [F]ather failed to appear. Then, on 18 September 2020, the trial court held [F]ather in contempt "for having willfully violated the trial court's Orders," stating he "may purge his contempt by paying [M]other child support arrears, past due medical expenses," and "the distributive award in the total amount of $1,800"; were he not to comply, [F]ather would face arrest. Additionally, the trial court found that, although its "Order was never modified and no motion to modify custody or child support was filed by either party," both [F]ather and [M]other agreed and confirmed that J.D. "resided with [F]ather from July of 2016 through June 19, 2018" and that, "in June of 2018, J.D. returned to [M]other's physical custody."

On 11 August 2020, [F]ather, acting *pro se*, filed a complaint against [D]efendants for "tortious interference with parental rights," libel per se, and "tortious interference with contract." Specifically, [F]ather alleged [D]efendants "knowingly, willfully, intentionally, and with reckless disregard induced J.D. to leave his home state of Rhode Island and take up residence in North Carolina," resulting in "the loss of the society and companionship" of J.D. for [F]ather. Father also alleged that [M]other published false statements when she "signed a verified complaint" alleging [F]ather had "willfully refused to make any child support payments since January of 2016," which, he argued, "would tend to impeach his reputation and credibility as a licensed attorney." Lastly, [F]ather alleged [D]efendant Chica had "willfully, intentionally, maliciously and without a proper societal motive interfered with the contractual 'consent agreement' entered into between" [F]ather and [M]other that allowed J.D.'s return to Rhode Island in 2016.

On 19 November 2020, [D]efendants filed an answer and counterclaims for intentional infliction of emotional distress and "punitive damages related to intentional infliction of emotional distress." Therein, [D]efendants also made three motions: a motion for "gatekeeper order" to "prevent [F]ather's abuse of the judicial process," alleging that [F]ather "has a history of filing frivolous pleadings against" [M]other; a motion for Rule 11 sanctions, alleging that [F]ather had "filed this cause of action for the purpose of harassing the [D]efendants," since, they contend, "there is no binding and enforceable contract in existence" with which [D]efendant Chica could have tortiously interfered; and a motion to dismiss pursuant to North Carolina Rules of Civil Procedure Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

The matter came on for trial on 11 February 2021 in Wake County District Court, Judge Mangum presiding. By order entered 17 February 2021, the trial court granted [D]efendants' motion to dismiss [F]ather's complaint for failure "to allege facts sufficient to state his claims for relief," thus dismissing [F]ather's complaint, and granted [D]efendants' motion for Rule 11 sanctions, finding [F]ather's complaint was "not verified, not well grounded in fact, not warranted by existing law, and is done to harass" [D]efendants. The trial court then reserved "the right to consider [D]efendants' request for a Gate Keeper Order for any new filings of [F]ather against [D]efendants in Wake County Court."

Father, through appellate counsel, gave notice of appeal on 16 March 2021.

*Id.*, slip op. at 1-5 (ellipses, original brackets, and footnotes omitted).

On 1 February 2022, Father's first appeal was dismissed because the 17 February 2021 Order ("2021 Order") was an interlocutory order based upon Defendants' pending counterclaims. *Id.*, slip. op. at 7. Father also "failed to show

that the trial court's order deprives him of a substantial right which would be jeopardized absent a review prior to a final determination on the merits." *Id.* (quotation marks and brackets omitted). On 15 June 2022, the Supreme Court of North Carolina denied Father's petition for discretionary review of this Court's opinion dismissing the first appeal as interlocutory. *See Bossian v. Chica*, 873 S.E.2d 10 (N.C. 2022).

On 26 February 2024, Defendants filed a Notice of Voluntary Dismissal of their counterclaims, and on 15 March 2024, Father filed notice of appeal again from the trial court's 2021 Order. Based upon the dismissal of Defendants' counterclaims, at this point the trial court's 2021 Order became a final order as all claims had been disposed and no further action by the trial court was needed "to settle and determine the entire controversy." *Bossian I*, slip op. at 5 (citations and quotation marks omitted). As this appeal is not interlocutory and Father timely appealed after Defendants' filing of the Notice of Voluntary Dismissal, this Court has jurisdiction to consider Father's appeal. *See Barfield v. Matos*, 215 N.C. App. 24, 35, 714 S.E.2d 812, 820 (2011) ("As all of the pending claims, crossclaims, and counterclaims as to all parties have been disposed of either by order or by voluntary dismissal, the 8 April 2010 summary judgment order is a final and appealable order." (citation omitted)).

## II. Motion to Dismiss under Rule 12(b)(6)

Father contends the trial court erred in dismissing his claims against both Mother and Defendant Chica for tortious interference with parental rights and

against Defendant Chica for tortious interference with contract.[1]

> The standard of review for an order granting a Rule 12(b)(6) motion to dismiss is well established. Appellate courts review de novo an order granting a Rule 12(b)(6) motion to dismiss.
>
> The word de novo means fresh or anew; for a second time[.] The appellate court, just like the trial court below, considers whether the allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory. In other words, under de novo review, the appellate court as the reviewing court considers the Rule 12(b)(6) motion to dismiss anew: It freely substitutes its own assessment of whether the allegations of the complaint are sufficient to state a claim for the trial court's assessment. Thus, the review of an order granting a Rule 12(b)(6) motion to dismiss does not involve an assessment or review of the trial court's reasoning. Rather, the appellate court affirms or reverses the disposition of the trial court—the granting of the Rule 12(b)(6) motion to dismiss—based on the appellate court's review of whether the allegations of the complaint are sufficient to state a claim.

*Taylor v. Bank of Am., N.A.*, 382 N.C. 677, 679, 878 S.E.2d 798, 800 (2022) (citations and quotation marks omitted).

## A. Tortious Interference with Parental Rights

Father first contends that the trial court erred in dismissing his claims for tortious interference with parental rights. Father alleges many details about the custody dispute between himself and Mother, but in summary, he alleges Mother and

---

[1] Father's complaint also included a claim for libel *per se* against Mother, but he has not challenged the trial court's dismissal of this claim on appeal. "Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned." N.C. R. App. P. 28(b)(6).

Defendant Chica interfered with his parental relationship with J.D. when they "induced" J.D. to move from Father's home in Rhode Island to the home of Defendants in North Carolina. Father's complaint also alleges details regarding the 2015 Order[2] addressing custody of J.D. under North Carolina General Statute Chapter 50. The complaint alleges the trial court entered an order "on or about February 11, 2015," granting "joint legal custody of the minor children" to Mother and Father and granting Mother "primary physical custody of the minor children" with visitation for Father as set out in the 2015 Order. Father alleged the details of various emails between them regarding their agreement for J.D. to move to Rhode Island to live with Father and that ultimately Mother "signed the 'Consent to Modification of Custody' agreement after February 22, 2016 and before July 1, 2016 in the presence of a notary. As such, [Mother] & [Father] mutually agreed that the scheduled adversarial hearing before the Honorable Judge Anna Worley was no longer necessary." However, Father's complaint also reveals that no court order modifying the child custody provisions of the 2015 Order was ever entered.

The portion of the 2021 Order addressing Defendants' motion to dismiss stated as follows:

> Defendants' Motion to Dismiss claims filed by [Father] is GRANTED. [Father] failed to allege facts sufficient to state his claims for relief, and [Father's] claims for Tortious Interference with Parental Rights (as it relates to both

---

[2] In this opinion, we will refer to the 2015 Permanent Child Custody and Child Support Order as the "2015 Order."

Defendants), Libel Per Se (as it relates to [Mother]), [Father] failed to show that a contract exists, and Tortious Interference with Contract (as it relates to Defendant . . . Chica) are DISMISSED.

Father confidently asserts that the "tort of interference with parental relations" is "well-established in North Carolina, and throughout the entire country." In support of this argument, Father cites to various sources other than North Carolina cases or statutes, relying upon the Restatement (Second) of Torts and cases from various states which may or may not address situations similar to the facts of this case. In any event, this Court is bound by North Carolina law, and even if the tort of interference with parental rights exists, North Carolina law does not support Father's claim based upon the facts as alleged by Father.

Father appears to have a fundamental misunderstanding of the effect of the 2015 Order granting joint custody of the parties' two sons to Father and Mother. He argues at length that the agreement between him and Mother for J.D. to reside with him in Rhode Island – without any court-ordered modification of the 2015 Order – "is sufficient to confer a superior right of custody to one parent." But Father cites no legally relevant authority for this proposition, and it is incorrect. Of course, for purposes of *de novo* review of the 2021 Order allowing the motion to dismiss, we accept as true Father's allegation that he and Mother signed an agreement for J.D. to reside in Rhode Island, despite the absence of any written agreement between him and Mother in our record. In fact, Mother did not dispute that she had agreed for

J.D. to reside in Rhode Island in 2016. But we review the trial court's legal conclusion that Father's complaint failed to state a claim for interference with parental rights *de novo*. *Id.* Although the law regarding the effect of a child custody order is well-established, this Court has previously addressed the effect of the very same 2015 Order as well as the informal agreement for J.D. to live in Rhode Island:

> *Both the Custody and Support Order and the Equitable Distribution Order have remained in effect without modification since February 12, 2015, and March 5, 2015, respectively. In January 2016, [Mother] and [Father] mutually agreed their younger son would move to Rhode Island with . . . [F]ather and [Father] would assume primary custody of him. The younger son resided in Rhode Island with [Father] from January 2016 until July 2018, at which time he returned to North Carolina to live with [Mother]. Neither parent sought permission from the trial court to modify the Custody and Support Order.*

*Bossian v. Bossian*, 284 N.C. App. 208, 210, 875 S.E.2d 570, 574 (2022), *disc. rev. denied*, 894 S.E.2d 751 (N.C. 2023) (emphasis added) ("*Bossian II*").

Although Mother and Father agreed for J.D. to reside in Rhode Island at all times relevant to Father's alleged claims, *Mother* always had primary physical custody of J.D. under the 2015 Order. The 2015 Order was never modified and it "remained in effect without modification since February 12, 2015." *Id.* Even if Mother "induced" J.D. to return to her home in North Carolina, she had a right to do

so as she still had primary physical custody of J.D. under the 2015 Order.[3]  And since

Defendant Chica and Mother lived together in the same home, even if Defendant

Chica joined in Mother's inducements of J.D. to return to North Carolina, his actions

were also consistent with the 2015 Order.

The only North Carolina cases cited by Father to support his argument are

*Howell v. Howell*, 162 N.C. 231, 78 S.E. 222 (1913), and *LaGrenade v. Gordon*, 46

N.C. App. 329, 264 S.E.2d 757 (1980).  In *LaGrenade*, this Court summarized the

father's common law "right to control of the child" described in 1913 in *Howell v.*

*Howell*:

> The father of a minor child is its natural guardian, at common law, and his rights of control over the child is superior to that of the mother, in the absence of a court's contrary determination of custody. Thus, a father has a right of action against every person who knowingly and wittingly interrupts the relation subsisting between himself and his child or abducting his child away from him or by harboring the child after he has left the house. In *Howell v. Howell, supra*, plaintiff husband had entered into a contract with his wife and her father that the parties' minor daughter might remain with the wife until the child was six years old. The husband subsequently obtained a divorce but no mention was made of custody of the child. When the child became six, according to plaintiff's complaint, the mother, with the aid of her father, removed the child from the State. The Supreme Court held that a cause of action existed for abduction.

---

[3] Father's complaint also alleged that the 2015 Order provided for J.D. to visit with Father at specific times, but if Father wished to enforce his visitation time with J.D., his remedy would have been by a motion in the cause to enforce the provisions of the 2015 Order at the relevant time, when J.D. was still a minor child.

*LaGrenade*, 46 N.C. App. at 331, 264 S.E.2d at 758 (citations omitted).

Both *Howell* and *LaGrenade* were based upon ancient common law principles giving a child's father "rights of control over the child . . . superior to that of the mother, in the absence of a court's contrary determination of custody." *Id.* Thus, Father's argument has two fatal flaws. First, here the trial court made a "contrary determination of custody" in the 2015 Order, and the 2015 Order granted Mother primary physical custody of J.D. *Id.* In *Howell* and *LaGrenade*, there was no custody order in effect. *Id.* at 331-32, 264 S.E.2d at 758-59. Second, the common law granting a father rights "superior to that of the mother" as to the custody and control of his children, upon which *Howell*, *LaGrenade*, and Father's argument are based, has been abrogated by legislation, as discussed at length by the Supreme Court of North Carolina in *Rosera v. Blake*:

> In 1967, our General Assembly repealed all prior statutes governing the custody of minor children and enacted N.C.G.S. § 50-13.1 to -13.8, a statutory scheme under which all child custody actions are now to be brought. N.C.G.S. §§ 50-13.1 to -13.8 were enacted to eliminate conflicting and inconsistent custody statutes and to replace them with a comprehensive act governing all custody disputes. When enacted, N.C.G.S. § 50-13.2 directed the trial courts to award custody based upon what will best promote the interest and welfare of the child. Significant to our discussion here, the legislature further amended N.C.G.S. § 50-13.2 in 1977 to provide between the mother and father, whether natural or adoptive, there is no presumption as to who will better promote the interest and welfare of the child.

*Rosero v. Blake*, 357 N.C. 193, 199, 581 S.E.2d 41, 45 (2003) (citations and quotation

marks omitted).

Father's brief also refers at times to the tort of abduction of a child although his complaint does not mention abduction specifically. Most of the ancient common law cases addressing abduction address it as a criminal offense. *See, e.g., State v. Burnett*, 142 N.C. 456, 55 S.E. 72 (1906). As a tort, some of the common law cases address abduction as a claim a father may bring, again based upon a father's superior rights at common law to the custody and control of a child. *See LaGrenade*, 46 N.C. App. at 332, 264 S.E.2d at 759. To the extent we can discern the elements of an ancient common law tort of abduction, it requires the "unlawful taking away or concealment of a minor child[.]" *Howell*, 162 N.C. at 234, 78 S.E. at 224. Father also cites to *Fungaroli v. Fungaroli*, 51 N.C. App. 363, 276 S.E.2d 521 (1981), and although this case may have involved a claim for abduction[4], the opinion addresses only personal jurisdiction as to one of the defendants under the long arm statute and procedural due process, not the substantive claims alleged in the plaintiff's complaint.

Even assuming North Carolina recognizes a claim for abduction by one parent

---

[4] In *Fungaroli*, the complaint alleged the plaintiff-mother had legal custody of the child and defendant-father

> acting in concert with both the codefendants, who are his parents, secretly left North Carolina with the minor child. They allegedly removed the child from this State for the purpose of defeating plaintiff's right to custody and in violation of G.S. 14-320.1. Thereafter, plaintiff allegedly went to the State of Virginia where defendants were residing with the child and demanded that they release the child to her. Plaintiff charged that the defendants refused to allow her even to see her child.

*Fungaroli v. Fungaroli*, 51 N.C. App. 363, 364, 276 S.E.2d 521, 522 (1981).

against the other, Father's complaint has not alleged that J.D. was unlawfully taken away, by either Mother or Defendant Chica, as Mother had primary physical custody of J.D. under the 2015 Order. Certainly Father also had custodial rights under the 2015 Order and he would have had a legal basis to enforce his visitation time while J.D. was still a minor by filing a motion in the Chapter 50 proceeding, but that is not the issue before us. Father has not alleged that Mother or Defendant Chica "spirited the child away beyond the state to some place unknown to the plaintiff." *Howell*, 162 N.C. at 232, 78 S.E. at 223. Instead, he alleged that J.D. returned to North Carolina to reside with Mother, who had primary custody of J.D. Even taking the allegations of Father's complaint as true, he did not state a claim for abduction.

Thus, upon *de novo* review, the trial court did not err by dismissing Father's claim for tortious interference with parental rights under Rule 12(b)(6) because "the complaint on its face reveals that no law supports the plaintiff's claim[.]" *Scheerer v. Fisher*, 202 N.C. App. 99, 102, 688 S.E.2d 472, 474 (2010) (quoting *Wood v. Guilford Cty.*, 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002)).

## B. Tortious Interference with Contract

Father next contends the trial court erred in dismissing his claim for tortious interference with contract against Defendant Chica. In his complaint, Father alleged Defendant Chica was aware he and Mother had "expressly entered into a written and orally agreed upon contract" or "consent agreement" for J.D. to reside with him in Rhode Island. Defendants argue Father's complaint failed to allege several elements

of this claim.

> The elements of a claim for tortious interference with contract are: (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 368 N.C. 693, 700, 784 S.E.2d 457, 462 (2016) (citation and quotation marks omitted).

Specifically, Father's complaint alleged as follows:

> 74. On and after January, 2018, [Defendant Chica] knew that [Mother] and [Father] had expressly entered into a written and orally agreed upon contract or "consent agreement," that as the biological parents of J[.]D[. ], was in their minor sons "best interest".

> 75. On and after January, 2018, in a series of affirmative acts, [Defendant Chica] willfully, intentionally, maliciously and without proper societal motive, interfered with the contractual "consent agreement" entered into between [Mother] and [Father].

> 76. At all times material hereto, [Defendant Chica] was an "outsider" to the contractual relationship between [Mother] and [Father] and the paternal relationship between J[.]D[. ] and his biological father, [Father].

> 77. As a direct and proximate result of the defendants intentional, willful, reckless, malicious and bad faith interference with the verbal and written contractual "consent agreement" between [Mother] and [Father], [Father] has suffered and will continue to suffer from extreme mental anguish, loss of sleep, loss of the care, comfort, society and companionship of his youngest son,

and has been otherwise injured and damnified.

We first note Father did not attach the alleged written portion of the contract to his complaint nor has it been presented to the Court in this or other proceedings between Father and Mother. *See Bossian II*, 284 N.C. App. at 219, 875 S.E.2d at 579. For purposes of Rule 12(b)(6), we take as true Father's allegation that he and Mother entered into a "verbal and written contractual consent agreement" for J.D. to live with Father. *See Taylor*, 382 N.C. at 679, 878 S.E.2d at 800. But the law is well established, as discussed above, that parents have no authority to modify a child support order or a child custody order by an informal agreement; a custody order must be modified by the trial court upon proper motion. *See Baker v. Showalter*, 151 N.C. App. 546, 551, 566 S.E.2d 172, 175 (2002) ("Individuals may not modify a court order for child support through extrajudicial written or oral agreements." (citation omitted)).

Father's complaint has failed to allege "a valid contract between [himself] and [Mother] which confers upon [himself] a contractual right against [Mother]." *Beverage Sys. of the Carolinas*, 368 N.C. at 700, 784 S.E.2d at 462 (citation and quotation marks omitted). Even if Father and Mother agreed for J.D. to reside in Rhode Island in 2016, this agreement did not confer any *contractual rights* to the physical custody of J.D. to Father. *Children* are not items of property to be possessed or owned based upon the provisions of a contract.

We reiterate: to modify a child support order or a child

custody order, a judicial modification by a court is required and individuals may not modify a court order for child support through extrajudicial written or oral agreements. It is well settled, no agreement or contract between husband and wife will serve to deprive the courts of their inherent as well as their statutory authority to protect the interests and provide for the welfare of infants. They may bind themselves by a separation agreement or by a consent judgment, but they cannot thus withdraw children of the marriage from the protective custody of the court. Any extrajudicial written agreement between the parties intended to modify the court ordered custody arrangement is invalid and does not implicitly or otherwise modify the parties' court ordered child support obligations. Simply put, the parties do not possess the authority to modify a child custody and support order without court intervention.

*Bossian II*, 284 N.C. App. at 222, 875 S.E.2d at 581 (citations and quotation marks omitted).

Although this Court was addressing Father's child support obligation under the 2015 Order in our 2022 opinion, the same is true of the 2015 Order's provisions regarding child custody. Father has failed to plead the first element of tortious interference with contract, the existence of a valid contract, *Beverage Sys. of the Carolinas*, 368 N.C. at 700, 784 S.E.2d at 462; we need not address the other elements. The trial court properly dismissed this claim under Rule 12(b)(6).

### III. Imposition of Sanctions under Rule 11

Father contends the trial court erred in imposing sanctions under North Carolina Rule of Civil Procedure 11(a), "awarding costs and attorney fees in the amount of $9,026.70." The portion of the 2021 Order addressing Defendants' motion

for sanctions stated as follows:

> 2. Defendants' Motion for Rule 11 Sanctions is GRANTED in the form of costs and attorneys fees in the amount of $9,026.70. [Father] shall pay said amount directly to Tharrington Smith, LLP, P.O. Box 1151, Raleigh, NC 27602 on or before May 1, 2021.
>
> 3. The Court finds that there are no probable grounds for relief in the Complaint.
>
> 4. [Father's] complaint is in violation of Rule 11 of the NC Rules of Civil Procedure as it is not verified, not well grounded in fact, not warranted by existing Law, and is done to harass the Plaintiff [sic].

Father also contends the 2021 Order "lacks findings to support an award of $9,026.70."

We review the trial court's decision to impose sanctions under Rule 11(a) *de novo* and we review the amount of sanctions for abuse of discretion:

> The trial court's decision to impose or not to impose mandatory sanctions under N.C.G.S. § 1A-1, Rule 11(a) is reviewable *de novo* as a legal issue. In the *de novo* review, the appellate court will determine (1) whether the trial court's conclusions of law support its judgment or determination, (2) whether the trial court's conclusions of law are supported by its findings of fact, and (3) whether the findings of fact are supported by a sufficiency of the evidence. If the appellate court makes these three determinations in the affirmative, it must uphold the trial court's decision to impose or deny the imposition of mandatory sanctions under N.C.G.S. § 1A-1, Rule 11(a).

*Turner v. Duke Univ.*, 325 N.C. 152, 165, 381 S.E.2d 706, 714 (1989). Further, regarding the appropriateness of the amount imposed by the trial court, "an abuse of

discretion standard is proper because the rule's provision that the court shall impose sanctions for motions abuses concentrates the court's discretion on the *selection* of an appropriate sanction rather than on the *decision* to impose sanctions." *Id*. (emphasis in original) (citations, quotation marks, ellipses, and brackets omitted).

Rule 11(a) addresses pleadings, motions, and other papers signed by both attorneys and parties representing themselves, despite the title of the subsection referring only to "signing by attorney":

> (a) Signing by Attorney.— Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated. *A party who is not represented by an attorney shall sign his pleading, motion, or other paper and state his address. Except when otherwise specifically provided by rule or statute, pleadings need not be verified or accompanied by affidavit. The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. If a pleading, motion, or other paper is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the pleader or movant. If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.*

N.C. Gen. Stat. § 1A-1, Rule 11(a) (2023) (emphasis added).

This Court has noted that

> [i]t is well established there are three parts to a Rule 11
> analysis: (1) factual sufficiency, (2) legal sufficiency, and (3)
> improper purpose . . . . A violation of any one of these
> requirements mandates the imposition of sanctions under
> Rule 11.
> . . .
> This court has held a two-step analysis is required when
> examining the legal sufficiency of a claim subject to Rule
> 11 inquiry. Initially, the court must determine the facial
> plausibility of the paper. If the paper is facially plausible,
> then the inquiry is complete, and sanctions are not proper.
> If the paper is not facially plausible, the second issue is
> whether, based on a reasonable inquiry into the law, the
> alleged offender formed a reasonable belief that the paper
> was warranted by existing law, judged as of the time the
> paper was signed. Rule 11 sanctions are appropriate where
> the offending party either failed to conduct reasonable
> inquiry into the law or did not reasonably believe that the
> paper was warranted by existing law.

*Ward v. Jett Props., LLC*, 191 N.C. App. 605, 607-08, 663 S.E.2d 862, 864 (2008)

(citations and quotation marks omitted).

Father argues the trial court erred to the extent it ordered sanctions based

upon his failure to verify the complaint. Father filed his pleadings in this action *pro*

*se*, and as the trial court noted, he did not verify his complaint in his capacity as

plaintiff, but he did sign the complaint indicating he was representing himself.

Father is correct that there is no *requirement* for his complaint to be verified; Rule

11(a) itself states "[e]xcept when otherwise specifically provided by rule or statute,

pleadings need not be verified or accompanied by affidavit." N.C. Gen. Stat. § 1A-1, Rule 11(a); *see HBD, Inc. v. Steri-Tex Corp.*, 63 N.C. App. 761, 762, 306 S.E.2d 516, 517 (1983) ("In general, pleadings need not be verified and no lack of credibility will be implied by the absence of a verification of plaintiff's complaint." (citations omitted)). Mother has not identified any statute or rule requiring that Father's complaint be verified, and we cannot identify any such requirement. Father's failure to verify the complaint is not a basis for sanctions under Rule 11(a). But Father did sign his complaint, and his signature as a party was a certification under Rule 11 that

> he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

N.C. Gen. Stat. § 1A-1, Rule 11(a). Father's signature on his complaint was the relevant certification under Rule 11(a), even though he did not also verify the complaint, but he would not be subject to sanctions for being "*in violation* of Rule 11 of the NC Rules of Civil Procedure," (emphasis added), because the complaint "[was] not verified."

The trial court also awarded sanctions because the complaint was "not well grounded in fact" and "not warranted by existing Law." Regarding the claims stated

in the complaint, Father argues that his claims were "in fact valid claims which should have survived the motion to dismiss." As discussed above, we disagree. Father's claims were not well-grounded in existing law or fact. His asserted legal basis for his claims were bits of the Restatement (Second) of Torts, mostly taken out of context, and cases from other states. Mother correctly notes that even the section of the Restatement relied upon by Father, "Causing Minor Child to Leave or not Return Home," does not support his contention that *North Carolina* recognizes a claim for intentional interference with parental rights as "the Restatement (Second) of Torts § 700 does not cite to any North Carolina cases[.]" The North Carolina cases Father relied upon, *LaGrenade* and *Howell*, entirely fail to support his arguments because there was a court order governing custody in this case. *See LaGrenade*, 46 N.C. App. at 331-32, 264 S.E.2d at 758-59. Father's arguments relied most heavily upon the purported validity of his "contract" with Mother for J.D. to live in Rhode Island, but this contract was not effective to change custody of J.D.[5]

Father is an attorney licensed in Rhode Island and Massachusetts but represented himself throughout most of this proceeding. However, even if he were

---

[5]In fact, we note Father has continued to assert the validity and effect of this "contract" in his brief in this appeal, filed after this Court issued its opinion in July 2022, stating:

> Any extrajudicial written agreement between the parties intended to modify the court ordered custody arrangement is invalid and does not implicitly or otherwise modify the parties' court ordered child support obligations. Simply put, the parties do not possess the authority to modify a child custody and support order without court intervention.

*Bossian II*, 284 N.C. App. at 222, 875 S.E.2d at 581.

not a licensed attorney, we hold all parties representing themselves to the same standard. *See Goins v. Puleo*, 350 N.C. 277, 281, 512 S.E.2d 748, 751 (1999) ("Nevertheless, the Rules of Civil Procedure promote the orderly and uniform administration of justice, and all litigants are entitled to rely on them. Therefore, the rules must be applied equally to all parties to a lawsuit, without regard to whether they are represented by counsel."). Father should have been well aware of the legal effect of the 2015 Order even before he was held in contempt of that order on 25 August 2021. If he was not already aware the 2015 Order was still in effect, he should have been put on notice of this fact by the trial court's issuance of an Order to Show Cause on 1 May 2020, a few months before he filed the complaint in this case.

We have already determined in our analysis of the trial court's dismissal of the complaint for failure to state a claim upon which relief may be granted that the complaint was not well-grounded in fact or warranted by existing law. However, "[w]e note that the mere fact that a cause of action is dismissed upon a Rule 12(b)(6) motion does not automatically entitle the moving party to have sanctions imposed." *Harris v. Daimler Chrysler Corp.*, 180 N.C. App. 551, 561, 638 S.E.2d 260, 268 (2006).

The trial court also determined that the complaint was "done to harass" Defendants.

> Our Courts have held that even if a paper is well grounded in fact and law, it may still violate Rule 11 if it is served or filed for an improper purpose. Defined as any purpose other than one to vindicate rights or to put claims to a proper test, an improper purpose may be inferred from the alleged

offender's objective behavior. Accordingly, under Rule 11, an objective standard is used to determine whether a paper has been interposed for an improper purpose, with the burden on the movant to prove such improper purpose. The movant's subjective belief that a paper has been filed for an improper purpose as well as whether the offending conduct did, in fact, harass movant is immaterial to the issue of whether the alleged offender's conduct is sanctionable. Improper purpose may, however, be inferred from the service or filing of excessive, successive, or repetitive papers or from continuing to press an obviously meritless claim after being specifically advised of its meritlessness by a judge or magistrate.

*Ward*, 191 N.C. App. at 609, 663 S.E.2d at 865 (citations and quotation marks omitted).

Here, the trial court did not make any findings as to the reasons for finding Father's purpose was to harass Defendants. "As a general rule, remand is necessary where a trial court fails to enter findings of fact and conclusions of law regarding a motion for sanctions pursuant to Rule 11." *Sholar Bus. Assocs., Inc. v. Davis*, 138 N.C. App. 298, 303, 531 S.E.2d 236, 240 (2000) (citation omitted). For example, in *Ward*, this Court upheld sanctions under Rule 11 where the trial court had "noted that plaintiff has filed at least forty-two actions in the past six years including a previous action alleging conduct identical to the instant case." *Ward*, 191 N.C. App. at 606, 663 S.E.2d at 864. Here, the trial court did not make findings regarding Father's improper purpose or harassment, although there was information or evidence before the trial court upon which it could make findings of fact. Therefore, we must remand for the trial court to make additional findings.

We also note that Father argues the trial court erred to the extent it relied upon Mother's counsel's argument regarding Father's previous lawsuit "against a different paramour of [Mother], causing [Mother] to spend thousands of dollars in legal fees." Father correctly notes that "it is axiomatic that the arguments of counsel are not evidence." *State v. Collins*, 345 N.C. 170, 173, 478 S.E.2d 191, 193 (1996). Yet Mother's brief argues "[t]here was evidence presented of [Father's] pattern of filing frivolous actions against" Mother "and now Defendant Chica," based specifically upon her counsel's *argument* to the trial court regarding a "jury trial [Father] initiated against an alleged paramour of [Mother]." If Mother's counsel's argument to the trial court was the only information before the trial court regarding Father's previous lawsuit against a "paramour" of Mother, Father is correct that the trial court could not base its determination of Father's improper purpose on factual information about a separate lawsuit stated only in counsel's argument where no testimony or evidence about the prior lawsuit was presented. Thus, as stated above, we must remand for the trial court to make additional findings.

## IV.  Sanctions under Rule 34

As to Father's argument addressing Mother's counsel's argument regarding the previous lawsuit, we must also note that Father's reply brief grossly violates our Rules of Appellate Procedure by making arguments entirely outside the issues on appeal and not based upon the record on appeal. Specifically, Father makes factual assertions regarding his own attorney fees in the first interlocutory appeal of this

case and argues that Mother and Defendant Chica were in violation of Rule 11 in bringing their counterclaims – dismissed before this appeal – against him. Father also makes additional factual assertions, not based upon the record, to case information "that became available online in Wake County on or about February 13, 2023" and even references to an alleged "domestic assault charge" against Mother.[6] Father claims that he "will decline the opportunity to ask this Honorable Court to consider these collateral matters," yet he still included them in his reply brief. We can discern no legitimate reason for Father to include these "collateral matters" in his reply brief. By addressing these entirely inappropriate matters in his reply brief before this Court, Father continues the same pattern he has pursued in the trial court in the filing of the complaint and discovery in this case.

Father's inclusion of these admittedly "collateral matters" in his reply brief is a gross violation of the Rules of Appellate Procedure. *See Sapia v. Sapia*, ___ N.C. App. ___, ___, 903 S.E.2d 444, 448 (2024) ("In violation of Rule 9(a) of the North Carolina Rules of Appellate Procedure, Wife's brief also refers to at least one document which was not included in our record, a Consent Order for Permanent Child Custody and Attorneys Fees." (citation omitted)). Father's reply Brief is particularly

---

[6] Father is apparently referring to North Carolina's new electronic filing system, Enterprise Justice (Odyssey). The mere availability of case information in the Enterprise Justice system does not change how appeals are conducted by this Court under the Rules of Appellate Procedure in any way; the information presented by the parties to the Court of Appeals must be provided in accordance with the Rules of Appellate Procedure.

egregious as he seeks to present additional information about the prior lawsuit filed against Mother's "paramour" – going far beyond anything mentioned in Mother's counsel's argument before the trial court – while simultaneously arguing the trial court should not have considered Mother's counsel's arguments regarding the very same lawsuit. On our own initiative, we will impose "sanctions of the type and in the manner prescribed by Rule 34 for frivolous appeals." N.C. R. App. P. 25(b). Specifically, the portions of Father's reply brief addressing these "collateral matters" are "grossly lacking in the requirements of propriety, grossly violated appellate court rules, or grossly disregarded the requirements of a fair presentation of the issues to the appellate court." N.C. R. App. P. 34(a)(3). Pursuant to Rule 34(c), on remand, the trial court shall hold a "hearing to determine one or more of the sanctions under subdivisions (b)(2) or (b)(3) of this rule." N.C. R. App. P. 34(c). Specifically, the trial court shall award additional reasonable attorney fees related to this appeal. But as Father's appeal is not entirely without merit, the trial court may award no more than one-half of Mother's reasonable attorney fees related to the appeal but may award less, in its sole discretion.

Upon *de novo* review, we conclude the trial court did not err in finding that Father's claims were "not well grounded in fact" and "not warranted by existing Law." However, we must remand for additional findings of fact to address the basis for the trial court's determination that the complaint "[was] done to harass" Defendants. We also remand for the trial court to make additional findings regarding the amount of

sanctions, including any sanctions related to violations of the Rules of Appellate Procedure in this appeal based upon Father's reply brief as noted above. Father did not make any specific argument on appeal regarding the amount of sanctions awarded by the trial court but only that the trial court did not make findings of fact as to how the amount was determined. We note that Mother's counsel submitted an affidavit for attorney fees to the trial court and the trial court awarded the amount stated in the affidavit. But we will not further address Father's argument as to the amount of sanctions awarded in the 2021 Order on appeal as we must remand for entry of a new order with additional findings as discussed above. The trial court shall on remand also make appropriate findings regarding the amount of any attorney fees and sanctions granted.

## V. Conclusion

The trial court did not err in dismissing Father's claims for tortious interference with parental rights as these claims were not well founded in good, applicable North Carolina law, nor did the trial court err in dismissing Father's claim for tortious interference with contract. We vacate the trial court's award of sanctions in the amount of $9,026.70 and remand for entry of a new order with additional findings of fact supporting the sanctions under Rule 11(a) as noted above and awarding sanctions for Father's violation of the Appellate Rules in his reply brief. The trial court shall hold a hearing on remand as required by North Carolina Rule of Appellate Procedure 34(d) to address the amount of sanctions to be awarded under

Rule 34.

AFFIRMED IN PART, VACATED AND REMANDED IN PART.

Judge FLOOD concurs.

Judge MURPHY concurs in part and concurs in result only in part by separate opinion.

MURPHY, Judge, concurring in part and concurring in result only in part.

I fully join the Majority in its analysis of the Rule 34 violation in Part IV and tortious interference with contract in Part II-B. However, I cannot join the Majority in its analysis of the alleged torts in Part II-A, as I agree they have not been recognized by our Supreme Court, and concur therein in result only. Further, as discussed in more detail below, I join the Majority fully in Part III but write separately to discuss what Father did not argue on appeal and its impact on our review.

The Majority correctly recognizes that neither tortious interference with parental rights nor abduction have been established as common law tort claims by our Supreme Court. This should be the end of our discussion, and we should not analyze elements of a "claim" that does not exist. "[T]his Court is not in the position to expand the law. Rather, such considerations must be presented to our Supreme Court or our Legislature[.]" *Shera v. N.C. State Univ. Veterinary Teaching Hosp.*, 219 N.C. App. 117, 126, 723 S.E.2d 352, 358 (2012). "This Court is an error-correcting court, not a law-making court." *Id.* at 127, 723 S.E.2d at 358. As a result, I do not join in the analysis of the alleged torts and concur in result only in part.

Finally, the consequences of Rule 11 sanctions in this published opinion, taken in passing, may impose a chilling effect on future litigants. However, it should be noted that Father made no argument on appeal that sanctions were not justified based on the complaint being a "good faith argument for the extension, modification,

or reversal of existing law[.]"  N.C.G.S. § 1A-1, Rule 11 (2023).  He only argued that his claims were "filed based on a good faith interpretation of North Carolina law."  If Father had argued that his filing was an attempt to start the process of having the North Carolina Supreme Court recognize his tort claims, I would have considered this portion of his appeal much differently.  In our common law system, litigants cannot be afraid to bring good faith arguments at the fringes or beyond the fringes of what has already been recognized based upon the arguments of others in the past.  This is how the common law develops and how it must continue to be developed.